J-S62016-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: W.D.A., JR. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.E.Z., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 984 WDA 2019 |

Appeal from the Decree Entered, June 5, 2019,
in the Court of Common Pleas of Erie County,
Orphans' Court at No(s): 13A In Adoption 2019.

BEFORE: PANELLA, P.J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:               FILED DECEMBER 10, 2019

J.E.Z. (Mother) appeals the decree granting the petition filed by the Erie County Office of Children and Youth Services (CYS) that involuntarily terminated Mother's parental rights to her 11-year-old son, W.D.A., Jr. (Child), pursuant to the Adoption Act.[1]  See 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).  At the termination hearing, Child's counsel was the same guardian ad litem (GAL) who represented him during the dependency proceedings.  Mother's sole issue on appeal is whether Child's legal interests conflicted with his best interests, as a conflict would deprive Child of his right to legal counsel under 23 Pa.C.S.A. § 2313(a).  After careful review, we

_____

[1] The orphans' court also terminated Mother's rights to her other son, two-year-old A.A.C.  Mother did not appeal that termination.  The court also terminated the parental rights of the children's respective fathers; they did not appeal those decrees.

conclude that the orphans' court did not abuse its discretion when it determined no conflict existed. We therefore affirm.

The record discloses the following pertinent history:

The family originally came to the attention of CYS in 2014 due to Mother's illicit drug use. Although Child was adjudicated dependent at that time, he eventually returned to Mother's care. Recent history began in March 2018, when Child was removed from Mother's care following an emergency protective order. The bases for the removal included Mother's unstable housing, inadequate supervision, her unstable mental health, and again, her drug use. Mother acknowledged that she had been an addict for 20 years, her drugs of choice being opiates, amphetamines, marijuana, and cocaine. The dependency court adjudicated Child dependent in April 2018.

Child's initial permanent placement goal was reunification. But throughout the dependency proceedings, Mother could not alleviate the circumstances that led to her children's removal. She failed to complete a dual diagnosis program, as she continued to test positive in drug screens or failed to attend them at all. Mother also attempted suicide. The record indicates that Mother only had two visits with Child. While CYS established times for phone calls between Mother and Child, often times Mother would not call. In late 2018, Child and his brother were placed with a kinship resource, L.P., who is a cousin of Mother. L.P. held herself out as an adoptive resource.

On January 30, 2019, upon a petition by CYS, the dependency court changed the placement goal from reunification to adoption concurrent with

legal custodianship. Legal custodianship was considered because Child was initially unsure whether he wanted to be adopted.

The orphans' court held the termination hearing on May 29, 2019. At the hearing, Child's GAL from the dependency proceedings continued to represent Child during the contested termination hearing. Mother objected to the GAL's representation, alleging that Child's best interests and legal interests conflicted, and that such a conflict deprived Child of his right to counsel under 23 Pa.C.S.A. § 2313(a).[2] The GAL responded that Child preferred adoption, i.e, that Child's best interests and legal interests merged, thereby allowing her continued representation. Satisfied by the GAL's explanation of Child's merged interests, the orphans' court overruled Mother's objection and subsequently terminated her parental rights.[3] Mother filed this timely appeal.

She raises one issue for our review:

_____

[2] Importantly, we note that Mother's attorney preserved the issue during the termination hearing, thereby properly raising the issue on appeal. See N.T., at 76; see also In re K.M.G., -- A.3d --, 2019 PA Super 281 (Pa. Super. September 13, 2019) (en banc)(holding that the Superior Court does not have the authority to review sua sponte whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding).

[3] The orphans' court determined that CYS established grounds under 23 Pa.C.S.A. § 2511(a)(1), (2), and (5) to terminate Mother's parental rights. The court determined further that termination would be in Child's best interests pursuant to Section 2511(b), notwithstanding Child's bond with Mother.

> Whether the orphans' court abused its discretion in terminating Mother's rights because Child's legal and best interests did not merge, were at conflict, and that legal counsel was not provided [to] Child?

See Mother's Brief at 6.

By not appealing other aspects of the orphans' court decision, Mother concedes that CYS established grounds for termination. Thus, the only question is whether Child actually preferred adoption; if he did not, then the GAL's representation would be defective under 23 Pa.C.S.A. § 2313(a), and we would be constrained to reverse.

We begin with our scope and standard of review regarding potential conflicts in termination cases:

> It is well settled that when we review an order granting or denying termination of parental rights, we accept factual findings and credibility determinations supported by the record, and we assess whether the common pleas court abused its discretion or committed an error of law. We may not reverse merely because the record could support a different result. We give great deference to the orphans' courts that often have first-hand observations of the parties spanning multiple hearings. Moreover, the orphans' court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Thus, we must give great deference to orphans' court credibility determinations and weight that the orphans' court places on the evidence regarding a potential conflict.

In re Adoption of K.M.G., -- A.3d --, 2019 PA Super 281, *4 (Pa. Super. September 13, 2019) (en banc) (citations and quotation marks omitted).

A child has a clear statutory right to counsel in contested involuntary termination proceedings:

- 4 -

> The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

An appointment of counsel representing the child is mandatory, and failure to do so is legal error. In re Adoption of G.K.T., 75 A.3d 521, 526 (Pa. Super. 2013) (citation omitted). This area of the law has been subject to considerable litigation in recent years, beginning with our Supreme Court's decision In Re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017). In that matter, a fractured Court interpreted Section 2313(a) to mean that a child involved in a contested termination hearing must be afforded counsel to represent his "legal interests," that is, the child's preferred outcome of the litigation.

However, there are instances when a child's GAL – who is typically a holdover from the dependency proceedings – may act as a child's counsel in a termination hearing, so long as the child's legal interests and best interests do not conflict. See In re D.L.B., 166 A.3d 322, 329 (Pa. Super. 2017) (interpreting L.B.M. and declining to remand for appointment of additional counsel for child who was represented by an attorney who advocated for child's non-conflicting best and legal interests).

The question at bar is whether Child's legal interests and best interests conflicted, thereby forbidding the GAL's continued representation of Child

during the termination hearing. Notwithstanding the GAL's averment to the orphans' court that no conflict existed, Mother argues that Child should have been appointed separate counsel, if only out of an abundance of caution. Specifically, Mother contends that Child never understood that he was entitled to pursue his preferred outcome. She emphasizes a critical moment of the dependency case, when a CYS caseworker told Child that returning to Mother was not an option. Mother cites to the fact that Child's interest in adoption wavered, and that he was upset when the caseworker told him he could not return to Mother's care. We certainly understand Mother's concern.

Since Child was adjudicated in April 2018, three CYS caseworkers have handled the case, and all of them testified at the termination hearing. The first caseworker, Kenneth Parmerter, testified that he never discussed with Child his relationship with Mother. See N.T., 5/29/2019, at 22. The second caseworker, Manuela Quevedo, took over the case in September 2018. Her involvement is the primary focus of Mother's appeal. Caseworker Quevedo was the caseworker in charge when in January 2019 the placement goal changed from reunification to adoption concurrent with legal custodianship. During her direct examination by CYS, Caseworker Quevedo testified about Child's wavering between returning to Mother and adoption:

> Q: And ultimately, did [Child] express a desire to be adopted?
>
> A: Correct.
>
> Q: Was that made to you?
>
> A: Yes.

Q: After [Child] expressed the desire to be adopted, [CYS] felt it necessary to pursue the termination of parental rights?

A: Correct.

[...]

Q: So at first, [Child] was kind of vacillating as to whether he wanted to be adopted or not. And that was at the January hearing, where the goal was changed to dual custodianship with adoption, correct?

A: Correct. I believe when it was explained to him the options that he had, he still believed he could go back to his mom. When it was explained to him that was not an option, he expressed wanting to be adopted by Ms. [L.P.].

N.T., at 28-30.

On cross-examination by Mother's counsel, Caseworker Quevedo

provided more detail:

Q: Initially, prior to the hearing in January of 2019, when Judge Trucilla decided to change the goal to [Subsidized Permanent Legal Custodianship] concurrent with adoption for [Child], did you have a discussion with [Child] prior to that hearing about what he wanted?

A: I had two discussions; yes.

Q: Is it true that [Child] wished to return to his mother?

A: Correct.

Q: But it was explained to him that he couldn't return to his mother, because his mother wasn't following the treatment plan?

A: Correct.

Q.      When was it that [Child] was told that he did not have an option, as far as whether to see his mother or not?

A:      It was the day after the court hearing.  He was having a lot of behavioral issues, and I went to school and had a real talk with him.

Q:      What exactly did you tell him?

A:      Well, he was confused.  Due to the conversation he had with [Mother] after the court hearing was over.  So, he was under the understanding that she still had another six months to get him back.  I had to explain to him in school that that was not true; that returning to his mother was not an option.  And he had the option to stay with [L.P.] and be adopted by [L.P.] and become a legal and permanent part of her family, or he could just stay there until the age of 18 and ultimately do something different.

[...]

Q:      Did [Child] ever tell you that he would like to have contact with his mother after the January 2019 hearing?

A:      I did not speak with him after the day I met him at school.

Q:      So, you never had a conversation with him that - - as fair as whether or not he would like to see his mother?

A:      Correct.

Q:      Because he was under the impression that he could either be adopted or just continue to live with [L.P.]?

A:      No.  He was under the impression that his mom needed six more months to go back with her.  And I had to clarify that to him, and given him the different options that he had after the court hearing that we held on January 30[, 2019].

Q:     Did you ever tell him that he had the option to have contact with his mother?

A:     I did.

Q:     What was his response?

A:     He was very upset about it.

Q:     Can you elaborate? He was upset, happy? Upset--

A:     He was upset, sad. He was crying.

[...]

A:     I – specifically, he had – the way the conversation went, he had some questions about the court hearing. I explained – he asked me if he was supposed to return home after six months. I told him that was not possible. That's when he started crying. I explained that his mother loved him very much, but it was something that was out of her control at this time. And it was something that - - we needed to make sure that he was in a stable place, a permanent place where he could thrive and develop properly. He was crying the entire time. I did explain to him, after he calmed down after a little bit, the options that he had. And then he explained to me that he wanted to be a permanent part of [L.P.'s] life and her family. And then I explained to him that if he wished, he could have contact with [Mother] in the future. Which at that time he started crying again. So I did not inquire more if he wanted to start having contact the week after, the month after. I did not inquire more specifically about it.

N.T., at 38-43.

The third and final caseworker, Rachel Campbell, testified that Child expressed a desire to be adopted. Id. at 50. On cross-examination, Caseworker Campbell conceded that she did not have a conversation with Child about his options. Id., at 51. Caseworker Campbell acknowledged on

- 9 -

cross-examination that she did not know whether Child would like to have any contact with Mother. Id.

We commend Caseworker Quevedo's tender consideration of Child's emotional well-being, particularly her reassurance to Child that he is loved by Mother. However, her explanation of Child's "options" is concerning and technically inaccurate. By virtue of the January 2019 goal change hearing, the dependency court relieved CYS from the burden of providing reunification services. At this point, it was highly unlikely that Child would return to Mother's parental care. From the agency's perspective, the case would result in one of two outcomes: permanent legal custodianship or adoption. But contrary to Caseworker Quevedo's explanation, from Child's perspective, he had the legal right to seek any of the following three options: permanent legal custodianship, adoption, or reunification.

Mother's argument is that when Caseworker Quevedo explained the proceedings, she led Child to believe that reunification was out of the question. Mother's implication is that the court could not discern whether Child's interests merged, because if Child was told his preferred outcome was impossible, then it follows that he would acquiesce to adoption.

At the termination hearing, during her cross-examination of Caseworker Quevedo, Mother's attorney raised this matter with the court:

[Mother's attorney]:

> And I think that, you know -- my understanding from the [GAL] is that [Child's] legal interests and his best interests

|  | merged.  But I have some concerns, based on some information that may have been provided to him prior to this hearing. |
|---|---|
| The court: | And you're entitled to inquire into that information.  But I'm not sure what you're asking is appropriate for this witness. |

Id. at 40.

At the end of the hearing, Mother's attorney preserved the issue of whether Child's interests merged.  The court allowed the GAL to elaborate about the merged interests:

| [GAL]: | I had met with [Child] a couple times.  I met with him prior to the January hearing.  At that time, it was his intent that he wanted to stay where he's at, at the home of [L.P.] but did not want to be adopted.  I felt that he still -- he expressed that he wanted a relationship with his mother at that time.  And that this is the reason why legal custodianship was basically put on the table, I believe. |
|---|---|
|  | This past time when I met with [Child], on May 18th [4], he basically expressed to me that he was okay with moving forward with the [involuntary termination] proceeding.  I explained the proceedings, and that his rights to his parents would be terminated. |
|  | [...] |
|  | And as regards to his mom, he didn't really say much about her, other than he really likes where he's at right now.  He likes his school.  He get along really well with [L.P.].  He's switching schools in the fall [...]. |

_____

[4] Eleven days prior to the termination hearing.

> He has a routine that he sets up. He goes to the Y in the morning, and after - - from the Y he's bussed to [school], and then bussed back to the Y, and then [L.P.] picks him up there. He gets along with his little brother, and expressed to me that he would like to remain there.

Id. at 76-77 (footnote added).

Whereupon, the proceedings concluded without Mother's attorney pressing the issue further. Notwithstanding our unease with Caseworker Quevedo's characterization of Child's having only two options, we conclude Mother's appeal does not merit a reversal of the orphans' court decision.

The question of whether there is a conflict between a child's legal and best interests is a mixed question of fact and law. To the extent that such a determination relies on fact, i.e., whether the GAL met with the child and ascertained the child's true preferences, "we must give great deference to orphans' court credibility determinations and weight that the orphans' court places on the evidence regarding a potential conflict." In re Adoption of K.M.G., supra, – A.3d --, 2019 PA Super 281, at *4. In other words, we must give all the deference that our abuse-of-discretion standard affords. And we also note that "a GAL has a professional responsibility to notify the court if there is a conflict so that the court may appoint separate counsel." Id.; see also Rule of Professional Responsibility 1.7.

Mother argues that the GAL did not actually aver that Child wanted to be adopted; rather, Mother cites the GAL's statement that Child "didn't have much to say about [Mother]." Mother's Brief at 12 (citing N.T., at 77). While

Mother quotes the GAL accurately, she ignores the GAL's previous statement: "[Child] basically expressed to me [(the GAL)] that he was okay with moving forward with the [involuntary termination] proceeding. I explained the proceedings, and that his rights to his parents would be terminated." N.T., at 76-77.

Evidently, the orphans' court was satisfied that the GAL made a truthful representation about meeting Child and explaining the process to him. Ideally, the orphans' court would have also been aware that the GAL had an affirmative, ethical obligation to notify the court if the GAL detected a conflict. In any event, the orphans' court accepted that Child's best interests and legal interests merged. The question now before us is whether this determination is supported by the record.

Mother contends that Child's preferred outcome, prior to the January 2019 goal change hearing, was to return to Mother's care. She surmises that following the January hearing, Child still wished to return to her care but did not articulate the same because Child was told that was not an option. On the other hand, according to the GAL, Child's preference prior to January 2019 was to reside with L.P., his kinship placement, in some capacity. See N.T., at 76. Assuming both of these facts are true, we still fail to see the conflict.

Witness testimony established that Child's emotions toward Mother ran the full gamut. The record supports an inference that Child wanted Mother to achieve sobriety so he could return home, but barring that, he wished to reside

in L.P.'s home. He may not have been sold on adoption or even permanent legal custodianship at the time of the goal change hearing in January 2019; he may have even wanted to eventually return to Mother. Still, at that point in the dependency proceedings, his best interests (to remain safe and secure with L.P.) and his legal interests (to remain with L.P. if Mother could not achieve sobriety) were not in conflict.[5]

By the time the orphans' court conducted the termination hearing four months later in May 2019, the GAL articulated that Child preferred termination so he could be adopted. Thus, even if we accept Mother's argument, that Child wished to return to her care throughout the dependency proceedings, the record still supports the determination that he wished to be adopted by the time the termination hearing occurred.

To conclude: we give great deference to the orphans' court determinations regarding a potential conflict. Given the GAL's ethical responsibility to raise the conflict if one is detected, the GAL's averments that she met with Child, and that Child desired adoption, we would be inclined to leave it at that. But because the record of Child's apprehension is more developed in this case, there is more to review. Reviewing the cold record,

_____

[5] Indeed, we note that Mother could have motioned for the appointment of separate counsel during the dependency proceedings had she perceived a conflict, but she did not. The dichotomy between best interests versus legal interests exists in the representation of a child during the dependency proceedings, and not just during a contested termination hearing. See In re J'K.M., 191 A.3d 907 (Pa. Super. 2018) (reversing the dependency court's denial of mother's motion for separate appointment and remanding for the appointment of separate counsel).

this Court could be tempted to reweigh the testimony and determine for itself what exactly Caseworker Quevedo meant when she told Child that returning to Mother was not an "option," or what the GAL meant when she said Child "basically expressed" that he was okay with termination, or what Child meant when he "didn't really say much" about Mother. Nonetheless, we must resist the urge to substitute our judgment for that of the orphans' court. Upon our review, we discern no abuse of discretion or error of law. The record supported the orphan's court decision that Child's legal interests did not conflict with his best interests.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/10/2019